**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>) No. CIV 10-634-TUC-CKJ<br>ASHTON COMPANY, INC., et.al., )<br>)<br>Defendants. ) **ORDER**<br>_____ )<br>)<br>CITY OF TUCSON, et al., )<br>)<br>Plaintiff-Intervenors, )<br>)<br>vs. )<br>)<br>BALDOR ELECTRIC COMPANY, )<br>et al., )<br>)<br>Defendants in Intervention. )<br>_____ ) | |

Pending before the Court is the State of Arizona's Motion to Approve Consent Judgment (Doc. 109). Defendants Industrial Pipe Fittings LLC, Tucson Foundry & Manufacturing Incorporated, Tucson Dodge Incorporated, Goodyear Tire & Rubber Company Incorporated, Texas Instruments, Incorporated, Ashton Company Incorporated Contractors and Engineers, Warner Propeller & Governor Company LLC have joined in the Motion.

*Procedural History*

On October 22, 2010, Plaintiffs State of Arizona and the State of Arizona ex rel. Benjamin H. Grumbles, Director, Arizona Department of Environmental Quality (collectively, "the State") filed a Complaint in this matter. On November 10, 2010, the State filed an Amended Complaint pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and pursuant to supplemental state law causes of action under the Water Quality Assurance Revolving Fund ("WQARF"), A.R.S. § 49-281 et seq., to recover costs incurred or to be incurred by the State to respond to a release or threat of a release of hazardous substances at and from the Broadway Pantano WQARF Registry Site #100053-00 in Tucson, Pima County, Arizona.

On February 10, 2011, the Court allowed the City of Tucson ("the City") to intervene.[1] On June 29, 2011, the Court allowed the Arizona Board of Regents and University of Arizona, Raytheon Company, Tomkins Industries, Inc., Tucson Airport Authority, Tucson Electric Power Company, and Pima County to intervene in this case.

On March 11, 2011, the State filed a Motion to Approve Consent Judgment (Doc. 109). The State seeks consent decrees based on negotiated settlements between the State and Ashton Company, Inc., Contractors and Engineers; Baldor Electric Company; Don Mackey Oldsmobile-Cadillac, Inc.; Dunn Edwards Corporation; Durodyne, Inc.; Fersha Corporation; Fluor Enterprises, Inc.; General Dynamics Corporation; The Goodyear Tire and Rubber Company; Lockheed Martin Corporation; Holmes Tuttle Ford, Inc.; Industrial Pipe Fittings, LLC; Tucson Foundry & Manufacturing, Inc.; Rowe Enterprises, Inc.; Pima County Community College; Rollings Corporation; Textron, Inc.; ABB, Inc.; Combustion Engineering, Inc.; Texas Instruments, Inc.; Tucson Dodge; Inc.; and, Warner Propeller and Governor, L.L.C.

---

[1] On October 9, 2011, the City's Complaint in Intervention was dismissed at the City's request.

- 2 -

On November 4, 2011, after oral argument and as directed by the Court, the State filed a Supplement to its Motion (Doc. 171).[2] Intervenors have filed a Response (Doc. 173) and the State has filed a Reply (Doc. 174).

Additionally, comments on the proposed settlements have been filed on behalf of Pima County (Doc. 79), Tucson Airport Authority ("TAA") (Doc. 85), Raytheon Company ("Raytheon") (Doc. 86), and the City (Doc. 96). TAAy also joins in the comments made by Raytheon (Doc. 85).[3] The University of Arizona has filed a Joinder in the Comments regarding the proposed settlements filed by the TAA and Raytheon (Doc. 98).

*Consideration of Consent Decrees*

The inquiry regarding whether to approve the consent decrees is whether the proposed settlements are procedurally and substantively fair, reasonable, in the public interest, and are consistent with the polices of CERCLA. *State of Arizona v. Nucor Corp.*, 825 F.Supp. 1452 (D.Ariz. 1992), *aff'd on other grounds*, 66 F.3d 213 (9th Cir. 1995), *United States v. Montrose Chemical Corp. of Calif.*, 50 F.3d 741 (9th Cir. 1995). In making such a determination, a court is to give deference to the government's evaluation of the proposal. *Nucor*, 825 F. Supp. at 1456, *citing United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84-86 (1st Cir. 1990). However, "[t]he true measure of the deference due depends on the persuasive power of the agency's proposal and rationale." *Montrose*, 50 F.3d at 746, *quoting Cannons*, 899 F.2d at 84. Further, "[t]here is a fundamental difference in the review of the

---

[2]Attached to the Supplement is the affidavit of Ana I. Vargas. Ms. Vargas is a chemical engineer and is currently the Manager of the Legal Support Unit in the Waste Programs Division of the Arizona Department of Environmental Quality ("ADEQ"). The State asserts that "Ms. Vargas performed the document review, analysis and numerical calculations to generate the early settlement offers that were submitted to all potentially responsible parties identified to date in the Broadway Pantano investigation." State Supplement, Doc. 171, pp.3-4.

[3]To the extent that Raytheon and TAA discuss whether this matter should be consolidated with 09-MC-00001-RCC, the Court notes that a motion to consolidate has not been filed. *See* L.R.Civ. 42.1.

- 3 -

1  sufficiency of evidence to support a settlement and the situation where there is no evidence
2  at all on an important point." *Montrose*, 50 F.3d at 746.

3  While courts have an obligation to "scrutinize" the settlement process to determine
4  whether the proposed decrees are both procedurally and substantially fair, *Montrose*, 50 F.3d
5  at 747, courts are not to conduct the same in-depth review of the facts and circumstances
6  considered by the State in arriving at a settlement. The reviewing court should "not . . .
7  substitute [its] own judgment for that of the parties . . . rather, it is to determine whether the
8  settlement represents a reasonable compromise . . . bearing in mind the law's generally
9  favorable disposition toward the voluntary settlement of litigation and CERCLA's specific
10 preference for such  resolutions." *United States v. Rohm & Haas Co.*, 721 F.Supp 666,
11 680-81 (D.N.J. 1989). Indeed, another district court has determined that, under such
12 principles, federal courts review CERCLA settlements with a "presumption" in favor of
13 approval. *City of New York v. Exxon Corp.*, 687 F.Supp. 677, 692 (S.D.N.Y 1988).

15 *Procedural Fairness*

16 To determine procedural fairness, courts "must look to the negotiation process and
17 'attempt to gauge its candor, openness and bargaining balance.'" *Nucor*, 825 F.Supp. at
18 1456, *citing Cannons*, 899 F.2d at 84. In considering this, the Court recognizes that, "under
19 CERCLA, the right to draw fine lines, and to structure order and pace of settlement
20 negotiations is an agency prerogative." *U.S. v. Grand Rapids*, 166 F.Supp.2d 1213, 1221
21 (W.D. Mich. 2000), *citing Cannons*, 899 F.2d at 93. The State asserts that, at the request of
22 several anticipated adverse parties ("AAPs"), the State prepared early settlement offers for
23 all of the AAPs based on the information in its files at that time.[4] Intervenors point out,
24 however, that the process was not open (e.g., the State has not disclosed demands made to

---

[4] The State's analysis indicates that, based upon a preliminary estimate of remedial action costs of $75 Million, the range of liability for each settling party extended from 0.01% of the estimated total clean up costs to 0.2%, or as expressed in dollar figures, from $10,000.00 to $150,750.00.

- 4 -

1    all the parties, has not identified what category each party was placed in, and has failed to
2    show reasonable linkage between factors in its formula and the proportionate share of the
3    potentially responsible parties) and that the settlements were the result of take-it-or-leave-it
4    demands. The State asserts that it is still at least 3 to 5 years away from completing its
5    remedial investigation of the site, its files are incomplete, and any settlement offer considered
6    the uncertainties that exist at this stage of the investigation.

7    The State, citing *United States v. Davis*, 261 F.3d 1, 23 (1st Cir. 2001), *quoting United
8    States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 281 (1st Cir. 2000),
9    asserts that "[t]here is no reason to doubt that the consent decrees were the result of 'arms'
10   length, good faith bargaining' between sophisticated parties." The Intervenors dispute this
11   conclusion, however, by asserting that, because the State has agreed to pay Joseph
12   Blankinship's share of the cleanup cost in exchange for his cooperation, the State has an
13   incentive to minimize his liability share. Further, because the State has not informed the
14   parties or the Court how it calculated this "orphan" share, the Court cannot conclude if the
15   settling parties are being allocated a fair and reasonable share of liability.[5] Indeed,
16   Intervenors argue that settlements that serve only to benefit the settling party, to the detriment
17   of the non-settling parties, merit enhanced scrutiny by the court.

18   However, Intervenors has not shown that the settlements serve only the settling parties
19   to the detriment of the non-settling parties. Rather, because the settlements are being reached
20   before the investigation is complete, the settling parties are each accepting a risk that the
21   settlements will not be to their benefit. Moreover, by agreeing to pay Blankinship's share
22   of cleanup costs in exchange for his cooperation, the State is placing itself in a position that
23   future negotiations with Intervenors will most likely involve scrutiny as to the proportionate
24   share of Blankinship's liability. That, however, does not mean that the State has acted in bad
25   faith or that the Intervenors in the future must accept the allocation conclusions reached by
26   the State. Moreover, it does not affect the State's ability to participate in arms' length, good

27
28        [5]Intervenors assert that Blankinship is the single largest actor by far at the site.

- 5 -

1  faith negotiations with the settling parties.

2  Additionally, the Court considers that the Intervenors were provided access to the State's
3  public records in conjunction with its Petition to Perpetuate Testimony of Mr. Blankinship
4  pursuant to Fed.R.Civ.P. 27, the Intervenors have received the documentation relied upon
5  by the State for its settlement offers, and the State described facts and methodology in
6  responding to public comments. *See e.g.* State's Brief, Doc. 157, p. 11.

7  In light of CERCLA and WQARF's encouragement of early settlements, *see e.g. United*
8  *States v. Montrose Chemical Corp. of California*, 827 F.Supp. 1453, 1458 (C.D.Cal. 1993),
9  the Court finds settlement agreements between the State and the settling parties were the
10 result of procedural fairness.

11

12 *Substantive Fairness and Reasonableness*

13 Substantive fairness "concerns the issues of corrective justice and accountability." *Nucor*,
14 825 F.Supp. at 1458.  Indeed, "a party should bear the costs of the harm for which it is legally
15 responsible." *Cannons*, 899 F.2d at 87.  In determining the reasonableness of a settlement,
16 the court should consider the "efficacy of the settlement in compensating the public for actual
17 and anticipated remedial and response costs and the relative strength of the parties'
18 litigating." *Nucor*, 825 F.Supp. at 1464.  The settlement terms must be based on an
19 acceptable measure of comparative fault that apportions liability according to a rational, if
20 necessarily imprecise estimate of how much harm the settling party has caused. *Nucor*, 825
21 F.Supp. at 1458-59; *Cannons*, 899 F.2d at 87.  The State's chosen measure of comparative
22 fault should be upheld unless it is arbitrary, capricious, and devoid of any rational basis.
23 *Nucor*, 825 F.Supp. at 1459; *Cannons*, 899 F.2d at 87; *see also In re Tutu Water Wells*
24 *CERCLA Litigation*, 326 F.3d 201. 207 (3rd Cir. 2003).

25 Intervenors seek to distinguish this case from other cases in which more details were
26 provided to the reviewing court. *See e.g. United States v. Alliedsignal, Inc.*, 62 F.Supp.2d
27 713 (N.D.N.Y. 1999) (reviewed assumptions used by the EPA regarding costs and liability
28 allocations, determined whether the parties were properly categorized (as generators,

arrangers, etc), and considered the contractual obligations of the parties); *Nucor* (negotiations commenced in 1989, resulting in proposed consent decree in 1991). In this case, Intervenors assert that the State simply has not provided sufficient information with which to evaluate the validity of the allocation which is the foundation of the settlement.

However, "requiring the parties to provide precise information about the extent of the total damages and the relative culpability of the various defendants would contravene CERCLA's primary goal of encouraging early settlements." *Montrose*, 827 F.Supp. at 1458. Moreover, contrary to Intervenors' assertion, the State has provided information from which the Court can evaluate the settlements. The State, through the ADEQ, reviewed interviews of over 800 witnesses and over 100,000 pages of documents, determined where gaps existed in its information to determine those areas where data was unknown and, therefore, where those uncertainties gave rise to risk in early settlements. Further, the States analyzed information about the site to determine those areas about which it had no information and therefore where additional risk of early settlement may be present, and completed a preliminary allocation to determine a rough allocation of share for each potentially responsible party based on its activities as a generator, transporter, owner or operator of the site. Although Intervenors argue that evidence relied upon by the State is not reliable, review of the specific evidence relating to each party would require this Court to conduct an in-depth review of the evidence, second guess the agency, and deny the required deference to ADEQ. The allocation by ADEQ used an established and accepted EPA model for allocations at landfill sites.[6] Additionally:

---

[6]The State used an approach substantially similar to the Nonbinding Preliminary Allocations of Responsibility ("NBAR") conducted by the EPA to encourage settlements by potentially responsible parties. State Supplement, Doc. 171, Affidavit, pp. 1-2. "An NBAR is a preliminary allocation of 100% of the 'total response costs at a facility' and allocates responsibility according to volume of waste contributed, as well as other settlement factors. In the case of multiple owners and operators of a particular site, the NBAR may be based on relative length of ownership and/or operation of the property. For generators, EPA states that the NBAR should be based on the volume each generator contributed. For transporters, the NBAR should also be based on volume, taking into account appropriate considerations

> In determining the estimated total cost of remediation of the Site, ADEQ staff assumed a final remedy operations and maintenance ("O&M") period of 30 years for the Site beginning in 2016 and ending in 2046. For the groundwater operable unit ("GOU"), the final remedy is aggressive and includes the addition of the Eastern Containment System ("ECS") and Far Western Treatment System ("FWTS"), continued operation of existing Western Containment System ("WCS"), and St. Joseph's Hospital wellhead treatment. The estimate includes a contingent wellhead treatment for one City of Tucson water supply well. For the landfill operable unit ("LOU"), the final remedy includes the maintenance of dross site fence/soil cover, and an upgrade of the Broadway North and Broadway South landfills bank protection and surface drainage.
>
> ADEQ staff utilized a variety of sources to conduct the cost estimation. ADEQ utilized the Remedial Action Cost Engineering Requirements computer program ("RACER") to estimate the cost of the ECS. The remaining costs were primarily based on past costs (plus an assumed inflation to bring the costs up to 2009), actual costs to ADEQ for several years prior to 2009, and cost estimates obtained from vendors.

State Supplement, Doc. 171, Affidavit, pp. 1-2 at 6-7, *footnote omitted*.

Intervenors assert that CERCLA and EPA policy support disclosure of more details before settlement. *See e.g.* OSWER Directive 9835.12-01a; *see also* 42 U.S.C. § 9622(e).[7] However, Intervenors have not pointed to any authority that requires the ADEQ to follow such procedures in this case. Rather, the issue is whether the Court can determine, based on the information before it, whether the proposed settlements are substantively fair and reasonable. The State has informed the Court of the factual bases (files, interviews, documents) for its conclusions. It has explained the methods (software, past costs, estimates) to reach remediation costs. Although the Court agrees with Intervenors that the State has not provided the Court with specific factual details as to each settling party (e.g., witness N of

---

such as packaging and placement of waste at the site. *Id*. at p. 2, *citations and footnotes omitted*. The Court notes that Intervenors assert that utilization of the NBAR process does not obviate the responsibility of settling parties to provide details prior to court approval of settlements. However, Intervenors have not pointed to any authority that *requires* such detail prior to approval.

[7]The Court notes that Intervenors object to the State's reliance on some CERCLA and EPA requirements and policies while not following them *in toto*. However, Intervenors have not cited to any controlling authority that requires a state to fully adopt a requirement/policy rather than utilizing a portion of a requirement/policy.

- 8 -

1  the 800 witnesses stated that settling party X deposited a specified tonnage of a specified
2  type of waste), such in-depth review of the facts and circumstances is not appropriate.
3  Indeed, although Intervenors argue that such review is needed, Intevenors have not pointed
4  to any controlling precedent that requires such in-depth review. As previously stated, this
5  Court's task:

> is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolutions.

*United States v. Rohm & Haas Co.*, 721 F.Supp 666, 680-81 (D.N.J. 1989), *citing Acushnet River & New Bedford Harbor: Proceeding re Alleged PCB Pollution*, 712 F.Supp. 1019, 1032 (D.Mass. 1989); *cf. Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3rd Cir.1982).

Intervenors also argue that a settlement based on a party's *de minimis* status would not be fair, reasonable, or consistent with CERCLA if that party is not, in fact, a *de minimis* contributor. The Court agrees with Intervenors that the State has not provided information from which the Court can confirm that the settling parties are *de minimis* contributors (the State has asserted that the range of liability for each settling party ranges from 0.01% of the estimated total clean up costs to 0.2%). However, again, Intervenors have not presented any controlling authority that such an in-depth analysis is required. To illustrate with random figures, if the ADEQ had determined that a specific settling party had contributed 2 tons out of 100 million tons of a specified type of waste, the Court would necessarily have to substitute its own judgment for the judgment of the ADEQ to confirm whether such a contributor was *de minimis*. This is what the reviewing standard seeks to avoid.

"The ADEQ, the agency charged with acting in the public interest, finds that the public interest is best served through entry of this agreement. [This Court finds] no reason to dispute this belief." *Nucor*, 825 F.Supp. at 1464. Even if the State has underestimated the total cost of clean up and the settling parties' proportional fault, the ADEQ has reached the conclusion that it is appropriate that the State accept some of the costs in the clean up in

return for information from the settling polluters.[8] It is not this Court's role to determine whether the settlement agreement is the best possible settlement that ADEQ could have achieved, but rather whether it is within the reaches of the public interest. *Nucor*, 825 F.Supp. at 1464. Indeed, as stated by the State during the October 17, 2011, hearing, the funds received from the settlements will allow further investigation to proceed; i.e., the State is disadvantaged by limited funds and the settlements are in the best interests of the public. The Court finds it is appropriate for the State to weigh the benefits to the State in foregoing reopeners, waivers, or premiums. The Court concludes the proposed settlements are reasonable and are in the best interest of the public.

*Contribution Protection*

Under both CERCLA and WQARF, Defendants are entitled to receive contribution protection. 42 U.S.C. § 9613(f)(2); A.R.S. § 49-292(C). Indeed, "[i]n passing the SARA amendments to CERCLA, Congress expressly created a statutory scheme which exposes non-settling parties to the risk of disproportionate liability." *Nucor*, 825 F.Supp. at 1463, *citations omitted*; *see also Davis,* 261 F.3d at 27 ("The practice of encouraging early settlement by providing broad contribution protection is provided in statute."). Moreover, "[w]hile the effect of the judgment on other parties and non-parties is a factor to be considered, the concerns of non-parties to the dispute is not determinative." *Grand Rapids Michigan*, 166 F.Supp.2d at 1219.

The Intervenors' request, therefore, for the Court to order that the State is prohibited from

---

[8]As pointed out by the State, the Arizona Legislature has provided funding for the State to make up for the difference between what the party pays, and the amount for which it may be liable under WQARF. A.R.S. § 49-281(10); A.R.S. § 49-282(E). Additionally, the Court notes that the State may consider the cooperation of a person, i.e., Mr. Blankinship, in determining that person's allocated share. *United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998); *see also United States v. Smith*, 196 F.3d 1034, 1038 (9th Cir. 1999) (not improper for government to make a deal with a witness in exchange for his testimony).

- 10 -

1  seeking joint and several liability against the non-settling parties, is not consistent with
2  CERCLA and WQARF.  Moreover, Intervenors' request contravenes the ripeness
3  requirement that ensures that issues are definite and concrete, not hypothetical or abstract.
4  *Jacobus v. Alaska*, 338 F.3d 1095, 1104 (9th Cir. 2003); *see also Abbott Laboratories v.*
5  *Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 684 (1967) (courts generally
6  invoke the ripeness doctrine and refuse to decide matters which would involve "entangling
7  themselves in abstract disagreements . . ."); *see also Watts v. Petrovsky*, 757 F.2d 964 (8th
8  Cir. 1985) (speculative claim was not ripe for review); *West v. Secretary of the DOT*, 206
9  F.3d 920, 924 (9th Cir. 2000) (courts avoid advisory opinions on abstract propositions of
10 law).
11     The Court finds the settlement provisions for contribution protection to be appropriate.
12
13 *Consistency with CERCLA's Objectives*
14     The agreements between the State and the settling parties must be consistent with the
15 CERCLA principles of "accountability, the desirability of an unsullied environment, and
16 promptness of response activities." *Nucor*, 825 F.Supp. at 1464; *Cannons*, 899 F.2d at 90-91.
17 "Settlements reduce excessive litigation expenses and transaction costs, thereby preserving
18 scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites.
19 *Davis*, 261 F.3d at 26-27.  The State points out that the funds obtained from the settlements
20 will be added to the WQARF fund and will assist the State in cleaning up the environment
21 at the site.  "Though the Government could likely obtain a judgment against [the settling
22 parties], the costs of litigating and levying against [these parties] would likely outstrip the
23 ultimate recovery.  By settling with [these parties] now, the Government insures what little
24 money the settlor has to contribute will be used to clean up the environment rather than pay
25 attorneys." *United States. v. Bay Area Battery*, 895 F. Supp. 1524, 1534 (N.D.Fla. 1995).
26 Indeed, the proposed settlements will streamline any eventual litigation by reducing the
27 number of potential defendants.  The Court finds that approval of the proposed settlements
28 will further the central principle of CERCLA.  The Court, therefore, will grant the Motion

to Approve Consent Decrees, will sign the proposed Consent Decrees, and direct the Clerk of the Court to docket the Consent Decrees.

Accordingly, IT IS ORDERED:

1. The Motion to Approve Consent Judgment (Doc. 109) is GRANTED.
2. The Clerk of the Court shall docket the Consent Decrees.
3. The Clerk of the Court shall enter judgment and shall then close its file in this matter.

DATED this 21st day of February, 2012.

*Cindy K. Jorgenson*
Cindy K. Jorgenson
United States District Judge