**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>ASHTON COMPANY, INC., et.al.,<br><br>    Defendants.<br>_____ | No. CIV 10-634-TUC-CKJ<br><br>**ORDER** |

Pending before the Court is the State of Arizona's Motion to Enter (Doc. 275). The State asserts that, consistent with the Ninth Circuit's ruling in *State of Arizona v. City of Tucson et al.*, 761 F.3d 1005 (9th Cir. 2014), its Motion to Enter, along with the State's prior Motion to Enter Consent Decrees (Doc. 109), the State's Supplement to its Motion to Enter Consent Decrees (Doc. 171), and the Affidavit of Ana Vargas (Doc. 171-1) provides sufficient information for the Court to find that the Consent Decrees are substantively and procedurally fair, reasonable, and consistent with the goals of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). No objection to the proposed consent decrees has been filed.

*Consideration of Consent Decrees*

The inquiry regarding whether to approve the consent decrees is whether the proposed settlements are procedurally and substantively fair, reasonable, in the public interest, and are consistent with the polices of CERCLA. *State of Arizona v. Nucor Corp.*, 825 F.Supp. 1452

(D.Ariz. 1992), *aff'd on other grounds*, 66 F.3d 213 (9th Cir. 1995), *United States v. Montrose Chemical Corp. of Calif.*, 50 F.3d 741 (9th Cir. 1995).  "[A] party who has resolved its CERCLA liability through a judicially approved consent decree 'shall not be liable [to other responsible parties] for claims for contribution regarding matters addressed in the settlement.'" *State of Arizona v. City of Tucson*, 761 F.3d at 1011 (quoting 42 U.S.C. § 9613(f)(2)).  In making a determination as to whether the approval of a consent decree is appropriate, a court is to give deference to the government's evaluation of the proposal. *Nucor*, 825 F. Supp. at 1456, *citing United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84-86 (1st Cir. 1990).  However, "where a state, as opposed to the federal government, is a party to a proposed CERCLA consent decree," the deference provided to the state is not to the same degree as would be afforded the federal government. *Arizona v. City of Tucson*, 761 F.3d at 1014.  Indeed, "[t]he true measure of the deference due depends on the persuasive power of the agency's proposal and rationale." *Montrose*, 50 F.3d at 746, *quoting Cannons*, 899 F.2d at 84.  Further, "[t]here is a fundamental difference in the review of the sufficiency of evidence to support a settlement and the situation where there is no evidence at all on an important point." *Montrose*, 50 F.3d at 746.

While courts have an obligation to "scrutinize" the settlement process to determine whether the proposed decrees are both procedurally and substantially fair, *Montrose*, 50 F.3d at 747, if the district court finds that a state environmental agency has expertise concerning the cleanup of a site, the court may afford "some deference" to the state's judgment concerning the environmental issues underlying the CERCLA consent decrees. *Arizona v. City of Tucson*, 761 F.3d at 1014.  However, a district court may not defer to the state's judgment that an agreement satisfies *Montrose*. *Id*.

*Expertise of the State of Arizona - Department of Environmental Quality*

"In 1986, the Arizona Legislature established the Arizona Department of Environmental Quality ("ADEQ") in response to growing concerns over groundwater quality. The ADEQ is the state regulatory agency charged with responsibility to investigate groundwater

- 2 -

contamination and enforce Arizona's environmental laws." *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 39 F. Supp. 3d 1059, 1062 (D. Ariz. 2014) (citation omitted). Indeed, the State asserts the ADEQ responsibilities include investigating hazardous sites under Water Quality Assurance Revolving Fund ("WQARF") program. A.R.S. §§281-298 and CERCLA, 42 U.S.C. §§ 9601-9675. Further, the State asserts that, during the past thirty years, ADEQ has entered into over sixty seven (67) other CERCLA settlements in the Arizona District Court, all of which this Court approved.

ADEQ's history, including judicially approved settlements, exhibits its specialized knowledge and expertise in cleaning up contaminated sites. *See generally State v. Arizona v. Motorola, Inc.*, 805 F.Supp. 748, 754 (D.Ariz. 1992). The Court, therefore, will afford some deference to ADEQ's judgment concerning the environmental issues underlying the consent decrees.

*Procedural Fairness*

To determine procedural fairness, courts "must look to the negotiation process and 'attempt to gauge its candor, openness and bargaining balance.'" *Nucor*, 825 F.Supp. at 1456, *citing Cannons*, 899 F.2d at 84. In considering this, the Court recognizes that, "under CERCLA, the right to draw fine lines, and to structure order and pace of settlement negotiations is an agency prerogative." *U.S. v. Grand Rapids*, 166 F.Supp.2d 1213, 1221 (W.D. Mich. 2000), *citing Cannons*, 899 F.2d at 93. The State has asserted that, at the request of several anticipated adverse parties ("AAPs"), the State prepared early settlement offers for all of the AAPs based on the information in its files at that time.[1]

The State, in its original Motion to Enter Consent Decree, cited *United States v. Davis*,

---

[1] The State's analysis indicates that, based upon a preliminary estimate of remedial action costs of $75 million, the range of liability for each settling party extended from 0.01% of the estimated total clean up costs to 0.2%, or as expressed in dollar figures, from $10,000.00 to $150,750.00. Additionally, the State has not incorporated "new facts that have been developed" since the agreements were originally reached. Motion to Enter (Doc. 275, p. 4).

- 3 -

261 F.3d 1, 23 (1st Cir. 2001), *quoting United States v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 281 (1st Cir. 2000), for the assertion that "[t]here is no reason to doubt that the consent decrees were the result of 'arms' length, good faith bargaining' between sophisticated parties." Motion (Doc. 109), p. 10. Here, the State asserts the Consent Decrees result from lengthy negotiations between ADEQ and the Defendants. Additionally, the State has openly explained the process of reaching the settlement amounts in this litigation. Further, in this litigation, interested entities have provided input and have engaged in settlement discussions. Additionally, the Court considers that interested entities were provided access to the State's public records in conjunction with its Petition to Perpetuate Testimony of Mr. Blankinship pursuant to Fed.R.Civ.P. 27, received the documentation relied upon by the State for its settlement offers, and the State described facts and methodology in responding to public comments. *See e.g.* State's Brief (Doc. 157), p. 11.

In light of CERCLA and WQARF's encouragement of early settlements, *see e.g. United States v. Montrose Chemical Corp. of California*, 827 F.Supp. 1453, 1458 (C.D.Cal. 1993), the Court finds settlement agreements between the State and the settling parties were the result of procedural fairness.

*Substantive Fairness, Reasonableness, and Public Interest*

Substantive fairness "concerns the issues of corrective justice and accountability." *Nucor*, 825 F.Supp. at 1458. Indeed, "a party should bear the costs of the harm for which it is legally responsible." *Cannons*, 899 F.2d at 87. In determining the reasonableness of a settlement, the court should consider the "efficacy of the settlement in compensating the public for actual and anticipated remedial and response costs and the relative strength of the parties' litigating." *Nucor*, 825 F.Supp. at 1464. The settlement terms must be based on an acceptable measure of comparative fault that apportions liability according to a rational, if necessarily imprecise estimate of how much harm the settling party has caused. *Nucor*, 825 F.Supp. at 1458-59; *Cannons*, 899 F.2d at 87. The State's chosen measure of comparative fault should be upheld unless it is arbitrary, capricious, and devoid of any rational basis.

*Nucor*, 825 F.Supp. at 1459; *Cannons*, 899 F.2d at 87; *see also In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201. 207 (3rd Cir. 2003).

Here, the State has provided information from which the Court can evaluate the settlements. The State, through the ADEQ, reviewed interviews of over 800 witnesses and over 100,000 pages of documents, determined where gaps existed in its information to determine those areas where data was unknown and, therefore, where those uncertainties gave rise to risk in early settlements. Further, the States analyzed information about the site to determine those areas about which it had no information and therefore where additional risk of early settlement may be present, and completed a preliminary allocation to determine a rough allocation of share for each potentially responsible party based on its activities as a generator, transporter, owner or operator of the site.

The development of the early settlement offers involved a determination of the apportionment of total liability among the liability groups and then the proportional share of liability for each individual party; a determination of the total estimated cost of remedial actions, and a determination of a settlement amount attributable to each PRP based on the proportional share for each specific parties. Vargas Aff. (Doc. 171-1), p. 1. Proportional shares were determined (a) using presumptive allocation percentages as discussed in EPA policies and guidelines, (b) considered the duration of ownership of the Site and the number of parcels owned or operated by owner or operators, (c) the known or estimated quantity and content of waste contributed by transporters (based on documents, witnesses, and approximations), and the volumes generated and deposited by the generator/arranger's as compared to the total volume disposed by all parties. *Id.*, pp. 2-6. Additionally, cost estimates were determined using the Remedial Action Cost Engineering Requirements ("RACER") computer program, past costs (plus an assumed inflation to bring the costs up to 2009), actual costs to ADEQ for several years prior to 2009, and estimates. *Id.*, 99. 7-8. The proportional shares of liability were multiplied by the estimated costs of remedial actions to determine the early settlement offers.

The allocation by ADEQ included using an established and accepted EPA model for

allocations at landfill sites.[2]  Additionally:

> In determining the estimated total cost of remediation of the Site, ADEQ staff assumed a final remedy operations and maintenance ("O&M") period of 30 years for the Site beginning in 2016 and ending in 2046.  For the groundwater operable unit ("GOU"), the final remedy is aggressive and includes the addition of the Eastern Containment System ("ECS") and Far Western Treatment System ("FWTS"), continued operation of existing Western Containment System ("WCS"), and St. Joseph's Hospital wellhead treatment.  The estimate includes a contingent wellhead treatment for one City of Tucson water supply well.  For the landfill operable unit ("LOU"), the final remedy includes the maintenance of dross site fence/soil cover, and an upgrade of the Broadway North and Broadway South landfills bank protection and surface drainage.

Vargas Aff. (Doc. 171), pp. 1-2 (footnote omitted).

The bases and methods for the State's conclusions, including the remediation costs, have been presented to the Court.  As previously stated, this Court's task:

> is not to make a finding of fact as to whether the settlement figure is exactly proportionate to the share of liability appropriately attributed to the settling parties; rather, it is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolutions.

*United States v. Rohm & Haas Co.*, 721 F.Supp 666, 680-81 (D.N.J. 1989), *citing Acushnet River & New Bedford Harbor: Proceeding re Alleged PCB Pollution*, 712 F.Supp. 1019, 1032 (D.Mass. 1989); *cf. Pennwalt Corp. v. Plough, Inc.*, 676 F.2d 77, 80 (3rd Cir.1982).

Even if the State has underestimated the total cost of clean up and the settling parties' proportional fault, the ADEQ has reached the conclusion that it is appropriate that the State

---

[2]The State used an approach substantially similar to the Nonbinding Preliminary Allocations of Responsibility ("NBAR") conducted by the EPA to encourage settlements by potentially responsible parties. State Supplement, Doc. 171, Affidavit, pp. 1-2. "An NBAR is a preliminary allocation of 100% of the 'total response costs at a facility' and allocates responsibility according to volume of waste contributed, as well as other settlement factors. In the case of multiple owners and operators of a particular site, the NBAR may be based on relative length of ownership and/or operation of the property. For generators, EPA states that the NBAR should be based on the volume each generator contributed. For transporters, the NBAR should also be based on volume, taking into account appropriate considerations such as packaging and placement of waste at the site. *Id.* at p. 2, *citations and footnotes omitted*.

accept some of the costs in the clean up in return for information from the settling polluters.[3]

Additionally, the parties and interested entities (i.e., former Intervenors) have stipulated *inter alia* to the following recitals:

> 8. Under WQARF, if a settling party pays less than its true fair share of liability, then the shortfall becomes an "orphan share" to be paid by the taxpayers. The shortfall cannot be collected from non-settling parties. A.R.S. § 49-281(10). See also Joint Supplemental Brief of State of Arizona and Defendants-Appellees, filed February 25, 2014 in Ninth Circuit Case No. 12-15691, n. 6 ("under Arizona law and the express terms of the settlements, any shortfall between what the settling party paid and its ultimate allocated share becomes an orphan share borne by the taxpayer. . . any shortfall in settlement amounts in the instant case cannot be shifted to [Intervenors].")
>
> 9. Each Settling Party's consent decrees provide, in Paragraph 32:
>
>> If Settlor's allocated share is determined by the Director or an Allocator, whichever occurs later, to be greater than the Settlement Amount, the difference shall be deemed an orphan share of liability pursuant to A.R.S. § 49-281(10).
>
> * * * * *
>
> 11. These provisions of law and the language of the consent decrees cited above preclude the State from seeking to impose upon Intervenors any share of liability other than their respective proportionate, or several, liability as to the Site. The State, Intervenors, and the Settling Parties hereby confirm that result in consideration of the Intervenors withdrawing all objections to the consent decrees, ending their requests for further discovery and proceedings regarding the proposed consent decrees.

Stipulation (Doc. 263), p. 4. Additionally, the parties and interested entities stipulated *inter alia* as follows:

> 3. In any future administrative or judicial proceeding under WQARF, CERCLA, or otherwise:
>
>> a. No Party shall be assigned any share of liability other than their respective proportionate, or several, liability as to the Site;
>>
>> b. Intervenors retain the right, as provided under A.R.S. §§ 49-281 et seq., to argue that the true share of any of the Settling Parties exceeds the amount paid in

---

[3] As pointed out by the State, the Arizona Legislature has provided funding for the State to make up for the difference between what the party pays, and the amount for which it may be liable under WQARF. A.R.S. § 49-281(10); A.R.S. § 49-282(E). Additionally, the Court notes that the State may consider the cooperation of a person, i.e., Mr. Blankinship, in determining that person's allocated share. *United States v. Township of Brighton*, 153 F.3d 307 (6th Cir. 1998); *see also United States v. Smith*, 196 F.3d 1034, 1038 (9th Cir. 1999) (not improper for government to make a deal with a witness in exchange for his testimony).

        settlement; and

        c. Should the State, an allocator, or a Court later determine that any Settling Party's payment is less than the Settling Party's fair share of liability at the Site, the shortfall shall not be collected from Intervenors or third parties.

*Id.* at 5. It is not this Court's role to determine whether the settlement agreement is the best possible settlement that ADEQ could have achieved, but rather whether it is within the reaches of the public interest. *Nucor*, 825 F.Supp. at 1464. The Court concludes the proposed settlements are reasonable and in the public interest.

*Consistency with CERCLA's Objectives*

The agreements between the State and the settling parties must be consistent with the CERCLA principles of "accountability, the desirability of an unsullied environment, and promptness of response activities." *Nucor*, 825 F.Supp. at 1464; *Cannons*, 899 F.2d at 90-91. "Settlements reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites. *Davis*, 261 F.3d at 26-27. The State points out that the funds obtained from the settlements will be added to the WQARF fund and will assist the State in cleaning up the environment at the site. "Though the Government could likely obtain a judgment against [the settling parties], the costs of litigating and levying against [these parties] would likely outstrip the ultimate recovery. By settling with [these parties] now, the Government insures what little money the settlor has to contribute will be used to clean up the environment rather than pay attorneys." *United States. v. Bay Area Battery*, 895 F. Supp. 1524, 1534 (N.D.Fla. 1995). Indeed, the proposed settlements will streamline any eventual litigation by reducing the number of potential defendants. The Court finds that approval of the proposed settlements will further the central principle of CERCLA. The Court, therefore, will grant the Motion to Enter, will sign the proposed Consent Decrees, and direct the Clerk of the Court to docket the Consent Decrees.

Accordingly, IT IS ORDERED:

1. The Motion to Enter (Doc. 275) is GRANTED. The Court approves the Consent

1  Decrees and contemporaneously signs the Consent Decrees.
2. The Clerk of the Court shall docket the Consent Decrees.
3. The Clerk of the Court shall enter judgment and shall then close its file in this matter.

DATED this 13th day of July, 2016.

_____
Cindy K. Jorgenson
United States District Judge